United States District Court
District of Connecticut
FILED AT NEW HAVEN
5/3 2004
Kevin F. Rowe, Clerk
By B. Rodko
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ALLSTATE INSURANCE COMPANY a/s/o JAMES F. LUCE, JR., and SIGURLIM LUCE,

Plaintiffs,

v.

TOASTMASTER INC.,

Defendant.

CIVIL ACTION NO. 303 CV 00604 (JBA)

Dated: May 3, 2004

**DEFENDANT TOASTMASTER INC.'S LOCAL RULE 56(a)1 STATEMENT IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN TESTIMONY OF PLAINTIFFS' EXPERT WITNESS, FRED PAUL III, AND FOR SUMMARY JUDGMENT**

Defendant, Toastmaster Inc. ("Toastmaster"), submits the following Local Rule 56(a)1 Statement in support of its Motion to Exclude Certain Testimony of Plaintiffs' Expert Witness, Fred Paul III, and for Summary Judgment:

**STATEMENT OF MATERIAL FACTS**

1. On April 16, 2001 at 12:26 p.m., the Vernon Fire Department responded to a fire at the residence of James F. and Sigurlim Luce (the "Luces"), 321 Phoenix Street, Vernon, Connecticut. (Complaint at ¶ 6.)

2. Plaintiffs allege that the fire was caused by a Toastmaster Model 342 Toaster-Oven-Broiler (the "subject toaster oven") that was in the Luces' kitchen when the fire occurred. (*Id.* at ¶¶ 6–8, 14.)

3. Plaintiffs expert witness, Fred Paul III, intends to opine at trial that "the fire origin was in the area above [the subject toaster oven]" and that "the fire started as a result of overheating of [the subject toaster oven]." (Paul Report, attached as **Exhibit 1**, at pp. 7, 9.)

4. Paul proposes to support these opinions based upon his inspection of (1) the subject toaster oven; (2) a microwave oven; (3) the receptacle that supplied power to the toaster oven and the microwave oven; (4) the wiring that supplied power to the receptacle; and (5) the remains of a blender. (*Id.* at pp. 7–9.)

5. Paul cites "the fire pattern, fire vector analysis, fire expansion, lines of demarcation, etc."[1] as further support for his opinions. (*Id.* at p. 9.)

6. Based on his inspection of the fire scene and the subject toaster oven, Paul will opine that

> [i]t is most probable that a failure of the electronic control allowed the unit to operate and overheat causing the wooden cabinets to overheat and ignite. The metal grease rack has indications of overheating that is consistent with damage caused by the elements in their high (broiler) heating position. My inspection found that the oven/broiler control knob was in the off position, thus the electronic control board is probably the reason for the failure. (*Id.* at pp. 9–10.)

7. Despite stating in the foregoing opinion that the toaster oven ignited the wooden cabinets above it, Paul changed his opinion during his deposition and testified that the subject toaster oven ignited the wall behind it. (Paul Deposition, attached as **Exhibit 2**, at p. 63 ln. 13 – p. 65 ln. 7.)

8. Paul will further opine that

> there is [sic] inadequate warnings in the instructions as far as placement of this unit in respect to wall mounted cabinets. There is a safeguard indicating that this appliance should be moved four to six inches away from the wall or any other object on the countertop. There is NO warning as to clearances from combustibles above this appliance. It is foreseeable, that without proper warning(s), these units will be placed on a countertop in close proximity to the combustible cabinets, as in this

---

1 Paul testified in his deposition that his use of the term "etc." does not imply any other basis for his opinion than those he listed specifically in his report. (Paul Depo. at 94 lns. 4–14.)

> case. Placing this unit in a similar location would allow clearance of less than ten inches from the top of the appliance to the combustible cabinets. When the appliance is used in the 'broil' mode the element will continue to supply ultimate heat to the housing of the unit. There should be a warning on clearances to all combustible materials. (Paul Report at p. 10.)

9. Based on these opinions, Paul concludes that

> this fire most probably started as a result of a malfunction of the electronic control board that allowed the appliance to overheat combustibles that were too close to the appliance. The lack of proper clearance warnings allowed the installation of this appliance between the countertop and the combustible cabinets. (*Id.* at 10–11.)

10. Paul is a member of the International Association of Arson Investigators ("IAAI") but cannot recall whether he is "certified" by the IAAI. (Paul Depo. at 9 lns. 14–18.)

11. Paul has a two-year associate degree in production engineering technology ("PET") from Wentworth Institute in Boston, Massachusetts that he received in 1972. (*Id.* at p. 14 ln. 16 – p. 15 ln. 13.)

12. Paul has had no formal engineering education since receiving his associate degree from Wentworth Institute. (*Id.* at p. 19 lns. 15–19.)

13. Paul has had no seminar training in engineering since receiving his associate degree from Wentworth Institute. (*Id.* at p. 19 lns. 20–23.)

14. At Wentworth Institute, Paul took courses in industrial engineering. (*Id.* at p. 15 lns. 10–13.)

15. Paul is a Registered Professional Engineer with the Commonwealth of Massachusetts in the field of industrial engineering. (*Id.* at p. 17 ln. 14 – p. 18 ln. 6.)

16. At Wentworth Institute, Paul took a one-semester course in basic electricity. (*Id.* at p. 17 lns. 2, 7–9.)

17. At Wentworth Institute, Paul took a one-semester course in electronics. (*Id.* at p. 17 lns. 3–4, 10–11.)

18. Paul does not recall whether he took any courses involving the effect of heat on materials while at Wentworth Institute. (*Id.* at p. 19 lns. 9–14.)

19. Paul received no training in fire investigation at Wentworth Institute. (*Id.* at p. 137 lns. 3–5.)

20. Generally, between one quarter and one half of Paul's professional work involves fires. (*Id.* at p. 27 ln. 17 – p. 28 ln. 16.)

21. Paul has no prior experience with investigating toaster oven fires. (*Id.* at p. 89 lns. 3–5.)

22. Paul has no electronics background in small appliances. (*Id.* at p. 51 lns. 7–8.)

23. Paul is not familiar with the Underwriters Laboratory standards that govern toaster ovens. (*Id.* at p. 170 lns. 19–21.)

24. In 1997, Paul testified at trial and in deposition as an expert in the case of *Denise v. Safety Kleen*, which involved a fire that he alleged was started by a pump motor on a parts cleaner in an auto shop. This is one of two cases since 1995 in which Paul has offered opinion testimony at trial about the cause and origin of a fire. (*Id.* at p. 41 ln. 10 – p. 42 ln. 19, p. 45 lns. 16–20.)

25. In 1997, Paul testified at trial as an expert in the case of *Janiszeski v. Sears*, which involved a fire. Paul cannot recall what he contended started the fire. This is one of two cases since 1995 in which Paul has offered opinion testimony at trial about the cause and origin of a fire. (*Id.* at p. 42 ln. 20 – p. 44 ln. 6, p. 45 lns. 16–20.)

26. In 2003, Paul testified in a mediation involving a lightning strike but did not give cause and origin testimony. (*Id.* at p. 37 ln. 10 – p. 38 ln. 7, p. 45 – ln. 22 – p. 46 ln. 8.)

27. All other cases in which Paul has testified as an expert since 1995 involved collapses of physical structures. (*Id.* at p. 32 ln. 18 – p. 37 ln. 9, p. 38 ln. 8 – p. 41 ln. 9, p. 44 ln. 7 – p. 45 ln. 1, p. 32 ln. 18 – p. 37 ln. 9, p. 38 ln. 8 – p. 41 ln. 9, p. 44 ln. 7 – p. 45 ln. 1.)



28. After writing his expert report in this case, Paul asked Richard Fain, a licensed professional electrical engineer, to look at the subject toaster oven. (*Id.* at p. 48 ln. 23 – p. 50 ln. 7.)

29. Paul asked Fain to inspect the subject toaster oven to make sure that Paul had not overlooked anything. (*Id.* at p. 50 lns. 8–13.)

30. Although Paul remembers Fain expressing that "a couple of the electronic things inside appeared to have been subjected to a lot of heat," Paul does not remember the names of those "electronic things." (*Id.* at p. 53 lns. 13–18.)

31. Paul does not know the source of the heat that damaged components of the subject toaster oven's circuit board. (*Id.* at p. 55 lns. 15–21.)

32. Paul contends that combustibles, either directly behind or above the subject toaster oven, were the first fuel for the fire. (*Id.* at p. 63 lns. 13–16.)

33. Paul does not know what types of combustibles were directly behind or above the subject toaster oven and thus cannot provide the ignition temperature of those combustibles. (*Id.* at p. 63 ln. 17 – p. 64 ln. 8.)

34. Paul cannot quantify the amount of convected heat that contributed in any way to the ignition of the fire. (*Id.* at p. 66 lns. 18–21.)

35. Paul does not believe that conductive heat had any impact on the ignition. (*Id.* at p. 66 lns. 22–24.)

36. Paul believes the vast majority of the heat that caused the ignition was radiant heat. (*Id.* at p. 67 ln. 1–4.)

37. Paul believes the radiant heat that ignited the fire came from the "back end or top" of the subject toaster oven. (*Id.* at p. 67 lns. 5–11.)

38. Paul does not know the exterior temperature of the subject toaster oven or similar toaster ovens when operating continuously. (*Id.* at p. 67 lns. 12–15.)

39. Paul contends that a malfunction caused the broiler in the subject toaster oven to operate continuously. (*Id.* at p. 67 lns. 20–23.)

40. Paul does not know whether the lower elements of the subject toaster oven were on at the time of the fire. (*Id.* at p. 68 lns. 8–15.)

41. Paul does not have an opinion as to when the upper (broiler) elements of the subject toaster oven turned on. (*Id.* at p. 68 lns. 17–19.)

42. Under Paul's theory, the longest the upper (broiler) elements could have been on before the fire was reported is 3 ½ hours. (*Id.* at p. 69 ln. 3 – p. 71 ln. 11.)

43. Paul does not know the highest temperature the top of the subject toaster oven can reach when heated for three hours continuously. (*Id.* at p. 71 lns. 16–19.)

44. Paul has no knowledge about the temperatures the subject toaster oven could reach. (*Id.* at p. 71 lns. 20–22.)

45. Paul does not know the highest temperature the back of the subject toaster oven can reach when heated for three hours continuously. (*Id.* at p. 71 ln. 23 – p. 72 ln. 3.)

46. Paul's expert opinions are based solely upon his reading of the burn patterns in the area of origin. (*Id.* at p. 72 lns. 4–15.)

47. Paul has done no testing to support his opinions and conclusions. (*Id.* at p. 72 ln. 24 – p. 73 ln. 3.)

48. Paul does not know whether there is anything on the subject toaster oven to prevent metal surfaces from touching a wall in back of it. (*Id.* at p. 73 lns. 9–12.)

49. Paul does not know whether there were other combustibles at the base of the burn pattern that were ignited in the course of the fire. (*Id.* at p. 76 lns. 14–18.)

50. When Paul inspected the subject toaster oven, he found its switches and levers to be in the "off" position. (*Id.* at p. 79 lns. 10–14, p. 82 lns. 11–19.)

51. Paul does not contend that there was a specific type of defect or failure in the subject toaster oven. (*Id.* at p. 82 ln. 20 – p. 83 ln. 17.)

52. Paul does not contend that any inadequacy in Toastmaster's warnings for the subject toaster oven caused the fire in this case. (*Id.* at p. 174 lns. 12–15.)

53. Paul contends that there was an unknown type of failure or malfunction in the electronic control board of the subject toaster oven. (*Id.* at p. 83 lns. 6–17.)

54. Paul cannot identify any defect in the printed circuit board of the subject toaster oven. (*Id.* at p. 84 lns. 1–6.)

55. Paul could not draw a circuit diagram for the subject toaster oven. (*Id.* at p. 105 lns. 9–11.)

56. Paul has not done any testing on the subject toaster oven's printed circuit board. (*Id.* at p. 84 lns. 7–11.)

57. Paul does not know if there is a failure mode of the subject toaster oven's printed circuit board that can turn the subject toaster oven on while its switches are off. (*Id.* at p. 84 lns. 17–21.)

58. Paul bases his opinion that a product like the subject toaster oven can turn itself on, in part, on a report of the U.S. Consumer Products Safety Commission for toaster ovens 1996 through September 27, 2001. (*Id.* at p. 84 ln. 22 – p. 86 ln. 12, p. 93 lns. 6–14.)

59. Paul does not know whether any of the toaster ovens in the Consumer Products Safety Commission Report were Toastmaster toaster ovens. (*Id.* at p. 91 lns. 18–24.)

60. Paul does not know what allegedly caused any of the toaster ovens in the Consumer Products Safety Commission Report to turn on. (*Id.* at p. 92 lns. 5–7.)

61. Paul bases his opinion that a product like the subject toaster oven can turn itself on, in part, on his conversations with fire investigators Dan Cronin of Rehobeth, Mass., and Richard Fain of Assonet, Mass. (*Id.* at p. 87 ln. 17 – p. 88 ln. 11, p. 90 ln. 22 – p. 91 ln. 3.)

62. Cronin did not tell Paul how many toaster ovens he knew of that had turned themselves on, nor did he tell Paul if any of the incidents he knew of involved Toastmaster toaster ovens. (*Id.* at p. 89 ln. 18 – p. 90 ln. 3.)

63. Fain did not tell Paul how many toaster ovens he knew of that had turned themselves on, nor did he tell Paul if any of the incidents he knew of involved Toastmaster toaster ovens. (*Id.* at p. 90 lns. 4–13.)

64. The U.S. Consumer Products Safety Commission report and his conversations with Cronin and Fain are the only sources on which Paul relies in forming his opinion that toaster ovens can turn themselves on. (*Id.* at p. 91 lns. 4–17.)

65. Paul has no opinion on whether there was a design or manufacturing defect in the subject toaster oven. (*Id.* at p. 104 ln. 24 – p. 105 ln. 4.)

66. Paul does not know whether, at the time of the fire, the subject toaster oven was in the same condition as when it came from the factory. (*Id.* at p. 105 lns. 5–8.)

67. In forming his opinions, Paul assumes that the upper (broiler) elements of the subject toaster oven were on at the time of the fire. (*Id.* at p. 106 lns. 6–10.)

68. In forming his opinions, Paul assumes that the subject toaster oven can transmit enough heat to the wall behind it to ignite the wall. (*Id.* at p. 106 lns. 18–21.)

69. Paul admits that his theory is necessarily incorrect if it can be shown that the subject toaster oven cannot transmit enough heat to ignite the wall behind it. (*Id.* at p. 107 lns. 21–24.)

70. The only two witnesses Paul interviewed in forming his opinions were Fire Marshal Maguda and Sigurlim Luce. (*Id.* at p. 109 lns. 16–18.)

71. Paul never requested an interview with James Luce. (*Id.* at p. 109 ln. 19 – p. 110 ln. 23.)

72. Paul drew no conclusions as to whether anything was resting on the subject toaster oven. (*Id.* at p. 118 lns. 10–14.)

73. Paul believes that a microwave located immediately left of the subject toaster oven was plugged in at the time of the fire. (*Id.* at p. 119 lns. 2–4.)

74. Paul believes that the subject toaster oven was plugged in at the time of the fire, based on his interview with Sigurlim Luce and based on the fire pattern. The electrical outlet near the subject toaster oven had already been removed when Paul began his investigation. (*Id.* at p. 120 ln. 20 – p. 121 ln. 14.)

75. Paul eliminated the microwave as a potential cause of the fire. He examined the microwave in eliminating it but says he "didn't need to." (*Id.* at p. 123 lns. 1–5, p. 124 ln. 20 – p. 125 ln. 11.)

76. Paul considered only the subject toaster oven, the microwave, the electrical outlet, and smoking as possible causes of the fire. (*Id.* at p. 127 lns. 8–11.)

77. Paul did not preserve the microwave after eliminating it as a possible cause of the fire. (*Id.* at p. 127 lns. 12–18.)

78. Paul did not give consideration to whether the fire was an incendiary fire. (*Id.* at p. 130 lns. 8–13.)

79. When Paul investigates a fire and believes an appliance is the cause, he routinely has an electrical engineer or electrician look at the appliance. (*Id.* at p. 134 lns. 9–16.)

80. When Paul determines that an appliance is in the area of origin of a fire, he does not attempt to do a failure analysis on the appliance. (*Id.* at p. 135 lns. 1–14.)

81. Paul owns a copy of NFPA 921 and considers it to provide reliable information. (*Id.* at p. 138 ln. 17 – p. 139 ln. 4.)

82. Paul agrees with the statement in NFPA 921 that before it can be concluded that a particular appliance caused a fire, it should be established how the appliance generated sufficient heat to cause ignition. (*Id.* at p. 140 lns. 13–18.)

83. Paul believes that subsequent fire damage in the course of a fire can obscure patterns that show where a fire began. (*Id.* at p. 142 ln. 22 – p. 143 ln. 1.)

84. Paul does not believe that the circuit board of the subject toaster oven ignited or was consumed. (*Id.* at p. 143 ln. 21 – p. 144 ln. 2.)

85. The end of the cord of the subject toaster oven that plugged into the wall was consumed in the fire. (*Id.* at p. 144 lns. 3–10.)

86. The end of the cord of the microwave that plugged into the wall was consumed in the fire. (*Id.* at p. 144 lns. 11–24.)

87. There was evidence of arcing on the power cord of the subject toaster oven. (*Id.* at p. 145 lns. 1–16.)

88. Paul agrees that microwaves can be competent ignition sources. (*Id.* at p. 155 lns. 20–22.)

89. Paul agrees that duplex outlets can be competent ignition sources. (*Id.* at p. 156 lns. 2–4.)

90. Paul found no burn patterns on the exterior of the toaster oven that indicated to him that it was or was not a cause of the fire. (*Id.* at p. 158 lns. 2–7.)

91. Paul is aware of no support in any professional literature concerning fire investigation to support the theory that the subject toaster oven could ignite the wall behind it or the cabinets above it. (*Id.* at p. 178 lns. 15–21.)

92. Paul knows of no way to develop a rate of error for his testing methodology. (*Id.* at p. 178 ln. 22 – p. 179 ln 7.)

93. Paul does not follow any written standards in his investigations. (*Id.* at p. 179 lns. 8–12.)

94. Paul does not know if his theory concerning the subject toaster oven's ability to ignite the wall behind it has general acceptance among fire investigators. (*Id.* at p. 179 lns. 13–24.)

95. Bruce V. Ettling conducted laboratory testing that proves the subject toaster oven could not have transmitted sufficient heat to ignite the wall behind it or the cabinets above it. (Ettling Affidavit and Report, attached as **Exhibit 3**, at p. 2.)

96. Dr. Ettling conducted testing that simulated the specific conditions and placement of the toaster oven in the Luce's kitchen and allowed an exemplar toaster oven to run continuously for over three hours. (*Id.* at p. 2.)

CARMODY & TORRANCE, LLP
Attorneys for Defendant Toastmaster Inc.

By:________________________

Maureen Danehy Cox (ct05499)
50 Leavenworth Street
P.O. Box 1110
Waterbury, CT 06721-1110
Telephone: (203) 573-1200
Facsimile: (203) 575-2600

*Of Counsel*
SONNENSCHEIN NATH &
ROSENTHAL
Robert O. Lesley
Brian W. Fields
Lynnette L. Siegel
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
Telephone: (816) 460-2400
Facsimile: (816) 531-7545

**CERTIFICATE OF SERVICE**

I certify that a copy of the above and foregoing document was served by first-class mail, postage prepaid, on the 3rd day of May, 2004, addressed to:

Margaret Ralphs
LAW OFFICES OF STUART G. BLACKBURN
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
Telephone: (860) 292-1116

and

David W. Smith
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Telephone: (215) 665-2103

ATTORNEYS FOR PLAINTIFF

Attorney for Defendant

CARMODY & TORRANCE LLP
Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
{W1299752} - 12 -
21176126\V-2